Case Number:_____

---------------------------------------------------------------------------------------------------------------

# IN THE UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF NEW YORK ("SDNY")

---------------------------------------------------------------------------------------------------------------

COMPLAINT

The United States of America Ex Relatione Turiyan M Gold

Plaintiff

v.

The United States of America

Respondent

|
|
|
|
|
|
|
|
|
|

Private Attorney General (Federal Civil RICO),
Special Prosecutor (Federal Civil RICO)
Relator and Real Party of Interest:

Turiyan M Gold
4700 12th Ave NE
Apartment 501
Seattle, WA
Cell: 360-970-4840
Email: tgold8888@outlook.com

i

# Jurisdiction and Venue:

**The Southern District of New York's (SDNY) most influential cases in *admiralty* and *interstate commerce*:**

**Admiralty Cases (Maritime Jurisdiction)**

- **1790s–1840s: Early Admiralty Dockets** SDNY handled seizures, forfeitures, and seamen's wage disputes as one of the first federal admiralty courts.
- **The China (1868)** — A collision case establishing liability principles for steamship navigation.
- **The Titanic (In re Petition of Oceanic Steam Navigation Co., 1914)** SDNY limited liability proceedings after the *Titanic* disaster, shaping U.S. maritime liability law.
- **The Lusitania (In re Petition of Cunard S.S. Co., 1915)** Claims arising from the German sinking of the *Lusitania* were filed in SDNY, testing international law and admiralty jurisdiction.
- **In re Oil Spill by the Amoco Cadiz (1978)** SDNY heard aspects of claims from one of the largest oil spills in history, reinforcing U.S. courts' role in global maritime disputes.
- **Exxon Shipping Co. v. Exxon Seamen's Union (1990s)** — Related to the *Exxon Valdez* disaster, SDNY handled maritime labor and insurance disputes tied to the spill.

**Interstate Commerce & Antitrust Cases**

- **United States v. Trans-Missouri Freight Ass'n (1890s, precursor cases in SDNY)** — Early antitrust enforcement against railroads moving goods in interstate commerce.
- **United States v. International Business Machines Corp. (IBM Antitrust Litigation, filed 1969 in SDNY)** A massive case alleging IBM monopolized interstate commerce in computing; one of the largest antitrust suits in U.S. history.
- **United States v. American Express Co. (SDNY 2010)** — Challenged AmEx's "anti-steering" rules under the Sherman Act; ultimately reached the Supreme Court, which upheld AmEx's practices in 2018.

# The Romero Case (1959):

- **Facts:** Francisco Romero, a Spanish seaman, was injured aboard a Spanish vessel in U.S. waters. He sued in federal court under the Jones Act and general maritime law("GML").
- **Issue:** Could federal courts hear his general maritime claims "at law" without diversity jurisdiction, simply because they were joined with a Jones Act claim?
- **Frankfurter's Holding:**
  - Federal courts have original jurisdiction over admiralty claims, but when a plaintiff brings a maritime claim "at law" (seeking jury trial), jurisdiction must rest on an independent basis (diversity or federal question).
  - The Jones Act provided a federal statutory claim, but general maritime claims were not automatically "federal questions" under 28 U.S.C. § 1331.

- o   However, once a Jones Act claim was properly before the court, the court could also hear related maritime claims under the doctrine of **pendent jurisdiction** (later codified as supplemental jurisdiction).

### "Romero Pendent Jurisdiction"

- The phrase refers to the **joining of general maritime claims with federal statutory claims** in one proceeding.
- It allowed plaintiffs to bring **maritime claims at law** (with jury trial rights) together with Jones Act or other federal claims, even if diversity was lacking.
- This avoided splitting claims between admiralty (bench trial) and law (jury trial).

### Evolution into Supplemental Jurisdiction

- After *Romero*, courts increasingly recognized pendent jurisdiction over maritime claims when tied to federal statutory claims.
- In 1990, Congress codified this principle in **28 U.S.C. § 1367**, which provides for **supplemental jurisdiction** over all claims that form part of the same "case or controversy."
- Today, this means that if a federal court has jurisdiction over a Jones Act claim, it can also hear related general maritime claims at law, even without diversity.

### The "Romero pendent jurisdiction" angle

What Frankfurter did leave open is that once a federal statutory claim (like a Jones Act claim) is properly before the court, the court can also hear related general maritime claims under **pendent jurisdiction** (now codified as **supplemental jurisdiction, 28 U.S.C. § 1367**). That's how general maritime claims "at law" can be heard in federal court without diversity.

### Supplemental Jurisdiction (§1367)

- Once a **federal statutory claim** is properly before the court, the judge may also hear **related general maritime claims** under **supplemental jurisdiction**.
- This is the modern codification of what was sometimes called **"Romero pendent jurisdiction."**
- Effect: Plaintiff can bring **Jones Act + general maritime claims together**, avoiding claim-splitting between admiralty (bench) and law (jury).

### Bivens Element, the Second Circuit's Position:

- The Second Circuit has **rejected the idea of a "constitutional carve-out"** from the discretionary function exception.
- **Key reasoning:**

- o The FTCA only allows suits for **state-law torts**, not for direct constitutional violations.
- o The discretionary function exception is a **jurisdictional bar**; once it applies, the court lacks subject-matter jurisdiction, regardless of whether the conduct is alleged to be unconstitutional.
- o Plaintiffs seeking redress for constitutional violations must generally proceed via **Bivens actions** against individual officers, not FTCA suits against the United States.

**Illustrative Cases:**

- **Cangemi v. United States (2d Cir. 2021):** The court reaffirmed that the discretionary function exception bars FTCA claims even where plaintiffs alleged government action was wrongful or unlawful.
- **Other Second Circuit precedent:** The court has repeatedly emphasized that the FTCA is not a vehicle for constitutional torts, and that the discretionary function exception applies broadly, insulating the government from liability even if the discretion is abused or exercised in a way that allegedly violates constitutional norms.

As a result of this any Bivens element was removed from my claim, and is only mentioned in reference to actions in other Venues and Jurisdictions.

# Hybrid Jurisdiction: *In Rem* as Procedural Proxy:

**Definition**

A **hybrid jurisdictional trigger** occurs when a claimant invokes *in rem* jurisdiction not because it's the preferred mode, but because *in personam* jurisdiction is unavailable or impractical—often due to:
- The defendant being a foreign entity
- Lack of minimum contacts with the forum
- Absence of contractual forum selection

**Functional Substitution**
- The vessel becomes the **jurisdictional anchor**.
- Arresting the vessel under **Rule C** of the Supplemental Admiralty Rules allows the court to assert jurisdiction over the res.
- This enables the litigation to proceed even if the owner cannot be personally haled into court.

**Case Illustration**
- *Republic of France v. United States*, 290 F.2d 395 (Ct. Cl. 1961): The court allowed in rem proceedings where in personam jurisdiction was diplomatically barred.
- *Frigate Bay Investments v. M/V CHARM*, 2006: Vessel arrest enabled jurisdiction despite foreign ownership and lack of personal service.

**Strategic Implications**

- **Procedural Leverage**: Plaintiffs use in rem arrest to compel appearance or settlement.
- **Security Mechanism**: Posting bond to release the vessel often brings the owner into the forum voluntarily.
- **Forum Engineering**: Hybrid triggers allow plaintiffs to litigate in favorable jurisdictions even when traditional personal jurisdiction fails.

**Dual-Track Jurisdiction: Case Precedents**

**1. B.D. v. Samsung SDI Co., Ltd. (7th Cir. 2025)**

**Context**: Stream-of-commerce doctrine split into two tracks:

- **End-product stream** (batteries in laptops, drills)
- **Derivative-product stream** (loose batteries sold to vapers)
- **Holding**: Jurisdiction valid only for claims arising from the end-product stream. The derivative stream was too attenuated to support specific jurisdiction.
- **Function**: Clarifies that jurisdiction must "arise out of or relate to" the specific stream of commerce invoked.

**2. Ramos v. Louisiana, 590 U.S. ___ (2020)**

**Context**: Criminal procedure, but relevant for its rejection of **dual-track incorporation**—the idea that constitutional rights could mean different things at federal vs. state levels. **Holding**: Sixth Amendment requires unanimous jury verdicts in both federal and state courts. **Function**: Undermines dual-track interpretive frameworks in constitutional law, reinforcing uniformity across jurisdictions.

**3. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980)**

**Context**: Stream-of-commerce jurisdiction. **Holding**: Unilateral actions by third parties cannot establish personal jurisdiction. **Function**: Sets boundaries for dual-track theories where one track involves purposeful availment and the other does not.

**4. International Shoe Co. v. Washington, 326 U.S. 310 (1945)**

**Context**: Foundational case for minimum contacts. **Function**: Establishes the framework for distinguishing between general and specific jurisdiction—often the basis for dual-track procedural analysis.

# Background on previous case(s):

**RICO with Federal Question Jurisdiction ("FQJ") designated "In Admiraly"?**

1. **Complaint pleads RICO?**
   - **Yes** → Federal Question jurisdiction under **28 U.S.C. § 1331**.
2. **Is the subject matter maritime?**
   - **Yes** → Admiralty jurisdiction also available under **28 U.S.C. § 1333**.
   - **See** "Admiralty–Aircraft Jurisdiction and Renvoi" on page xxvi and "Maritime and Admiralty Jurisdiction in Contract "on page xxvii
3. **Rule 9(h) designation "in admiralty"?**
   - **Yes** → Case is treated as **RICO in admiralty**:

| | |
|---|---|
| 153 | ▪ No jury trial. |
| 154 | ▪ Maritime remedies (e.g., vessel arrest, maritime liens). |
| 155 | ▪ Maritime choice-of-law principles apply alongside RICO. |

**Key Takeaway**

- **RICO alone** = federal question jurisdiction.
- **RICO + maritime facts** = dual jurisdiction (federal + admiralty).
- **Rule 9(h) designation** = shifts the procedural framework into admiralty mode, even though the substantive law is still RICO.

**Gold v. Global Aerospace Underwriting Managers LTD Case # 24-CV-03296-RC**

A day after receiving a notice from the United States District Court of the District of Columbia for Gold v. Global Aerospace Underwriting Managers LTD case #: 24-CV-03296-RC for a motion to dismiss granted, I filed a FTCA claim with the United States Department of Justice ("DOJ") Civil Division by certified mail on 6/3/2025.

My manner of approach is to follow the traditional common law and civil law rules for service upon "The Crown" which is for all intents and purposes our FCRP rule for when the United States as a Party.  The "Barristers for the Crown" being The United States Attorneys and Attorney Generals for the United States representing the parties and respondents et al. (See FTCA RICO case statement)

On July 28th 2025 I received a denial of claim from the DOJ Civil Division.  Gold v. Global Aerospace Underwriting Managers LTD was a prior case that was initiated back into Federal Court by way of my Federal Civil RICO suit filed with the Middle District of the State of Florida.

For the record, Global Aerospace Underwriting Managers LTD were the underwriters for Air Canada, with headquarters based in the United Kingdom.

While drafting an In Rem Action for the Canadian Federal Court in 2021 I accidentally discovered that Gold v. Harper et al ("The Crown") case #: 24-CV-03296-RC was actually removed for Federal Question.

I was not only not informed of this at the time in 2012.   Gold v. Harper was confirmed to have been updated on the docket in February 2022, 10 years after filing in 2012.  With another curious feature, that my entire claim was deleted, saving only the front page and end page.

On filing with the Canadian Federal Court, I came across an interesting feature.  In the drop-down menu there was a selection for Airline.  My IN REM action was on the "Aircraft Side" of  it's Admiralty Court.  I will comment on this later in regards to Conflicts-of-Law issues.

191    **Gold v. Harper Case # 8:12-cv-02089**
192
193        Gold v. Harper being by implication Quasi In Rem, and Gold v. Global Aerospace
194    Underwriting Managers LTD was designated by Rule 9(c) this following statements by the
195    Special Prosecutor and Private Attorney General are intended to evoke prosecutorial immunity
196    by virtue of Federal Civil RICO and by virtue of Libel in Admiralty and Maritime Jurisdiction:
197
198    **In Re the Northeast Blackout of 2003**
199
200        In 2003 Hillary Rodham Clinton, United States Senator from New York, Governor
201    George Pataki of the State of New York and Mayor Bloomberg of the State of New York all
202    made statements to the effect that the Northeast blackout of 2003 was "Canada's fault".
203
204        I designate these three named individuals as the "Crown" of the State of New York for
205    the purposes Libel in Admiralty.  These statements already alleges a Proximate relationship of
206    Canada to the Northeast Blackout of 2003.
207
208        In addition based on information and belief, the plaintiff relates the following details:
209
210        The Libellant was directly involved in the incidents that resulted in at least two Wired
211    News article Private Lives Laid Bare on Net (June 25th 1999) and Cell-Phone calls streamed on
212    Net (June 24 1999)
213
214        The plaintiif was present on the EFnet chatroom #dwc at the time of the incident(s), and I
215    was also streaming the audio on Winamp Shoutcasat.  As a matter of fact, what is not stated by
216    James Glave is that his voice is actually speaking on the intercepted calls.
217
218        These articles occurred the days after the incident.  The archive of the calls were stored
219    on "DWC's" Slashdot hosted website as .mp3's and are in possession by the Vancouver Police
220    Department and the Royal Canadian Mounted Police  ("RCMP").
221
222        The conversation intercepted where Air Canada employee's operating out of of the
223    Vancouver International Airport.  The disturbing details were about frequent power outage
224    effecting Air Traffic Control Systems and Ground Radar at the Vancouver airports.  I personally
225    experienced and witnessed power outage and computer network failure at of the Toronto
226    International Airport in 2003.
227
228        On information and belief, this effected the function of the Computerized Reservation
229    Systems ("CRS") which also control Air Traffic and Plane Approaches.  Canada is the first
230    country to have a trans-national airline and a CRS, RES I and RES II, later RESERVEC.
231
232
233        I am choosing the SDNY in this instance as an appropriate Jurisdiction and Venue
234    because the nature of the original claims refers to injuries that affected the state of New York
235    most negatively.  The details of the original claim of Gold v. Harper were not reflected in case
236    history because Gold v. Harper was only just updated in the docket about a decade later.

# Corrigenda:

Since its inception due to draftsman errors, the Federal Tort Claims Act ("FTCA") 28 U.S.C. § 1346, Pub. L. 79–601 puts forth an inept choice-of-law rule. Corrections and Pleadings in "Long Hand" form of my FTCA claim as follows:

# Conflicts of Law Issue(s):

### Choice-of-Law: Federal Civil RICO ("Racketeering")

RICO was enacted by the political branch in 1970, when Congress passed Title IX of the Organized Crime Control Act and President Nixon signed it into law, creating a statutory weapon against enterprises engaged in patterns of racketeering:

- **Congressional Passage:**
  - Senate passed the bill on **January 23, 1970** (74–1).
  - House passed it on **October 7, 1970** (341–26).
- **Presidential Signature:** President **Richard Nixon signed it into law on October 15, 1970** as **Public Law 91-452**.
- **Codification:** RICO was placed in **18 U.S.C. §§ 1961–1968**.

Congress legislated, the President executed, and the judiciary later interpreted.

The Liberal Construction Rule **84 Stat. 947, § 904 (Oct. 15, 1970)** is part of the **Organized Crime Control Act of 1970**, Title IX of which created **RICO** (Racketeer Influenced and Corrupt Organizations Act) but **904 was not codified** into the text of Title 18. Instead, it appears only in the **statutory notes** following 18 U.S.C. § 1961.

Section 904(a) of the Racketeer Influenced and Corrupt Organizations Act (RICO) mandates liberal construction, but this directive is a standalone provision from the original Act in order to give its provisions an expansive meaning to fulfill Congress's purpose.

This effectively made Federal Civil RICO a Supraconstitutional "Superlaw"

### Why Scholars Call RICO "Supraconstitutional":

1. **Statutory Power Beyond Constitutional Limits**
   - RICO's treble damages and enterprise liability can punish conduct that, if analyzed under the First Amendment alone, might be protected speech or assembly.
   - In *Scheidler*, the fact that RICO litigation persisted for years against protest activity illustrates how the statute can overshadow constitutional defenses until the Supreme Court steps in.
2. **Private Enforcement with Public-Law Teeth**

- o Congress gave private plaintiffs the ability to enforce RICO with remedies usually reserved for the state.
- o This delegation means private actors can, in effect, enforce federal policy in ways that rival constitutional enforcement mechanisms.

3. **Judicial Observations**
   - o Commentators note that RICO's breadth makes it function like a "superstatute" — one that **reshapes the constitutional landscape** by creating new liabilities and remedies that courts must reconcile with fundamental rights.
   - o In practice, this can make RICO feel "supraconstitutional," because it can be invoked even where constitutional protections (like free speech) would otherwise block liability.

RICO is "supraconstitutional" because Congress gave it such sweeping scope and remedies that it can be used to reach conduct at the very edge of constitutional protection. In cases like *Scheidler v. NOW*, RICO's civil provisions were powerful enough to entangle First Amendment protestors for nearly two decades, showing how a statute enacted by the political branch can, in effect, overshadow constitutional defenses until the Supreme Court reins it back.

## Why Civil RICO Functions as a "Superlaw":

1. **Treble Damages (Triple Recovery)**
   - o Plaintiffs who prove a RICO violation automatically receive **three times their actual damages**, plus attorney's fees.
   - o This is far more punitive than most civil statutes, making it a uniquely powerful deterrent.
2. **Expansive Standing**
   - o Any "person injured in their business or property" by a pattern of racketeering activity can sue.
   - o This opened the door to private enforcement, not just government prosecutions.
3. **Broad Definition of "Racketeering"**
   - o RICO incorporates dozens of predicate offenses (mail fraud, wire fraud, bribery, extortion, etc.).
   - o This means conduct that might otherwise be prosecuted under narrow statutes can be bundled into a RICO claim.
4. **Enterprise Concept**
   - o RICO targets not just individuals, but *enterprises* (corporations, partnerships, informal associations).
   - o This allows plaintiffs to reach deep into organizational structures and hold entire networks accountable.
5. **Bypassing Immunities**
   - o Because RICO was enacted by Congress as a statutory weapon, it can sometimes **pierce defenses** like qualified immunity or state sovereign immunity when officials or entities act outside lawful authority.
   - o This is why believe I am right to list it alongside Piercing Doctrines like conspiracy, it's one of the few tools that can cut through otherwise formidable shields.

316 **Political Branch Intent**

317 • Congress wasn't just criminalizing mob activity; it was **delegating enforcement power**
318 **to private citizens**.
319 • By doing so, it created a hybrid statute: part criminal law, part civil remedy, part
320 antitrust-style deterrent.
321 • That's why scholars and courts often call it a *"superstatute"* or *"superlaw"* — it
322 reshaped the legal landscape by empowering both the state and private actors to
323 dismantle corrupt enterprises.

# 324 Federal Questions in Relation to State Law:

# 325 1. Congressional Supremacy

326 • Congress may **specify the rule of decision** to be applied.
327 • Any contrary state rule is **supplanted** by federal statute.
328 • Basis: **Supremacy Clause**.

# 329 2. Federal Common Law (Specialized Areas)

330 Federal courts may create federal common law when:

331 • (a) The issue is **within federal lawmaking competence**.
332 • (b) Congress has **not specifically legislated** on the subject.
333 • (c) There are **important federal interests** and a **need for uniformity**.
334     ○ Federal interests may be inferred from related statutes or constitutional structure.

335 **Examples:**

336 • Maritime law
337 • Foreign relations
338 • Interstate disputes
339 • Rights and duties of the U.S. as a sovereign

# 340 3. Supremacy Clause & The Erie Doctrine

341 • If **federal common law applies**, there is **no Erie problem**.
342 • Key consequences:
343     ○ (a) If Congress later legislates, the **statute supersedes** the federal common law.
344     ○ (b) A case based on federal common law is a **federal question**.
345     ○ (c) **State courts** must apply the federal rule.
346     ○ (d) **Federal courts in diversity** must also apply the federal common law.

347  o  (e) Even tort claims may fall under federal common law if they are **directly tied**
348  **to a federal domain** (e.g., maritime torts).

349  # 4. Federal Programs & Commercial Paper

350  • Federal law governs **rights of the U.S.** under nationwide programs.
351  o  Example: U.S. rights/duties on commercial paper.
352  • State law governs **private disputes** over commercial paper.
353  • State law may be **incorporated** into federal law where:
354  o  Uniformity is not essential.
355  o  Reliance interests exist (e.g., UCC in commercial transactions).

356  # 5. Foreign Relations

357  • Foreign relations are **entrusted to the executive branch**.
358  • Judicial interference risks **frustrating national goals**.
359  • Courts generally defer to the **political branches** in this domain.

360  # Quick Takeaway

361  • **Congressional statute** → always supreme.
362  • **Federal common law** → fills gaps where federal interests demand uniformity.
363  • **Supremacy Clause** → ensures federal rules bind both state and federal courts.
364  • **State law** → governs unless displaced, but may be incorporated by reference.
365  • **Foreign relations** → reserved to federal executive authority, not state law.

366  **What should happen when there is Federal Question jurisdiction when the claim involves**
367  **RICO (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968)?**

368  ## 1. RICO as a Federal Statute

369  • RICO is a **federal law**, enacted under Congress's Commerce Clause power.
370  • Any claim brought under RICO **arises under federal law** → this gives federal courts
371  **federal question jurisdiction** under **28 U.S.C. § 1331**.
372  • No need to rely on diversity jurisdiction if the complaint pleads a valid RICO cause of
373  action.

374  ## 2. Private Right of Action

375  • **18 U.S.C. § 1964(c)** creates a private right of action:
376  o  Any person injured in their business or property by reason of a RICO violation
377  may sue in federal court.
378  o  Remedies include **treble damages** and attorney's fees.
379  • Because Congress expressly created this cause of action, **state law is supplanted** to the
380  extent of conflict (Supremacy Clause).

### 3. Interaction with State Law

- **State law claims** (e.g., fraud, tortious interference, breach of contract) often appear alongside RICO claims.
- Federal courts may exercise **supplemental jurisdiction** over these state claims under **28 U.S.C. § 1367**, since they form part of the same case or controversy.
- State courts have **concurrent jurisdiction** over civil RICO claims unless Congress explicitly makes jurisdiction exclusive to federal courts (it has not).
  - o But if a state court hears a RICO case, it must apply **federal substantive law**.

### 4. Federal Common Law Not Needed

- Unlike maritime or foreign relations, RICO is **statutory**.
- Federal courts interpret and apply the statute directly, so there's no Erie problem.
- However, courts may borrow **state law concepts** (e.g., definitions of fraud, predicate offenses) where RICO incorporates them by reference.

### 5. Key Federal Question Issues in RICO

- **Predicate Acts**: Must be violations of specified federal or state crimes listed in § 1961(1).
- **Pattern Requirement**: Requires at least two predicate acts within 10 years, showing continuity and relationship.
- **Enterprise Element**: Must prove the existence of an "enterprise" affecting interstate commerce.
- **Causation**: Plaintiff must show injury "by reason of" the RICO violation (proximate cause).

# Quick Takeaway

- Filing a RICO claim = **automatic federal question jurisdiction**.
- State law claims can be heard alongside under **supplemental jurisdiction**.
- State courts can hear RICO cases, but must apply **federal law**.

There was no Erie problem because RICO is a **federal statutory scheme**, not judge-made common-law.

**The Constitutional Shift (1787–1789):**

- The U.S. Constitution created a **federal government with direct authority over individuals**, not just states.
- States did not cease to exist, but their sovereignty was **qualified**:
  - o They could no longer coin money, make treaties, or maintain standing armies (Art. I, Sec. 10).
  - o They ceded supremacy in areas like interstate commerce, foreign affairs, and war.
- Yet, they retained broad powers over internal governance (police powers, property law, family law, etc.).

**The Doctrine of Quasi-Sovereignty:**

- After ratification, states were no longer "sovereign" in the international-law sense. They could not conduct foreign policy or act as independent nations.
- Instead, they became **quasi-sovereign**
  - They retained sovereignty over internal matters.
  - They shared sovereignty with the federal government in concurrent areas (e.g., taxation, criminal law).
  - They lost sovereignty in areas where the Constitution granted exclusive power to the Union.
- The Supreme Court articulated this balance in cases like:
  - *Chisholm v. Georgia* (1793): initially treated states as fully sovereign, but backlash led to the 11th Amendment.
  - *McCulloch v. Maryland* (1819): affirmed federal supremacy; states cannot tax or obstruct federal institutions.
  - *Texas v. White* (1869): declared the Union "indestructible," states cannot secede, sovereignty is permanent but limited.

**The Conceptual Shift:**

- **Articles Era**: States = sovereign nations in confederation.
- **Constitutional Era**: States = quasi-sovereign members of a federal union.
- **Modern Doctrine**: States are "sovereign within their sphere," but always subject to the supremacy of federal law.

# Remedies for Breach of Trust:

Traditionally, when a trustee breaches fiduciary duty:

- **Civil Remedies** (equity):
  - Removal of the trustee
  - Surcharge (personal liability for losses)
  - Restitution or disgorgement of profits
  - Constructive trust over misappropriated assets
- **Criminal Penalties** (in egregious cases):
  - Embezzlement, fraud, larceny charges and racketeering particularly 18 U.S.C. § 1962(a) if the trustee misuses assets.

# Administrative / Federal Overlay:

In modern law, especially where trusts intersect with federally regulated funds or pensions, **administrative penalties** come into play:

- **ERISA ("Employee Retirement Income Security Act")**: Fiduciaries of pension and benefit plans are subject to Department of Labor oversight. Breaches can trigger **civil penalties, removal, and federal injunctions**.
- **5 U.S.C. § 8477 ("Thrift Savings Plan")**: Federal law explicitly imposes fiduciary duties on trustees of federal retirement funds, with **civil liability and penalties** for breach.
- **Banking/Corporate Trustees**: When a bank or trust company serves as trustee, it is subject to **federal banking regulators** (OCC, FDIC, Federal Reserve). Mismanagement can lead to administrative sanctions, fines, or *removal of fiduciary powers*.

## The Structural Point:

- In **private family trusts**, penalties remain mostly civil (removal, surcharge).
- In **institutional or federally regulated trusts**, penalties can be **administrative** (fines, regulatory sanctions, disqualification).
- This creates a modern hybrid: the equitable "breach of trust" doctrine is now reinforced by **federal administrative law**, especially in contexts where trusts manage retirement, investment, or public funds.

## Analogy to Public Trust Doctrine:

Just as a state that mismanages its **public trust** over navigable waters can be checked by federal supremacy (Commerce Clause, environmental regulation), a trustee who breaches fiduciary duty can be checked not only by **civil equity courts** but also by **federal administrative enforcement** when the trust touches federally regulated domains.

## "Ense petit placidam sub libertate quietem"

Translated as ***"By the sword we seek peace, but peace only under liberty"***

- Written by Algernon Sidney (c. 1660), an opponent of Stuart absolutism.
- Adopted by Massachusetts in 1775, in the crucible of revolution.
- It encodes a paradox: peace is desirable, but only if it is grounded in liberty; otherwise, peace under tyranny is no peace at all.

By utilizing a cluster of cases dealing with federal Fourth Amendment doctrines, Massachusetts tort and criminal law, and the public/private boundary, I will illustrate that they all orbit around the same tension created by the motto itself: **how far can authority (public or private) go in restraining liberty in the name of order or peace or "uniformity"?**

**1. Private vs. State Action**

- *Burdeau v. McDowell* and *United States v. Harding*: private searches don't trigger constitutional protections.

- *Commonwealth v. Leone* and *Commonwealth v. Mahnke*: But, when private actors act like the state, constitutional limits creep back in.
- Pattern: Liberty is protected against the *sword of the state*, but not always against private intrusion, unless private power becomes quasi-sovereign.

## 2. False Imprisonment & Shopkeeper's Privilege

- *Coblyn*, *McDermott*: merchants may act to preserve order, but only within narrow bounds.
- Pattern: Peace (detention of suspected thieves) is tolerated only if liberty (freedom from wrongful restraint) is not unduly sacrificed.

## 3. Self-Defense & Retreat

- *Donahue*, *Kendrick*, *Shaffer*, *Gagne*: Massachusetts often requires retreat, limits excessive force, and rejects absolute "stand your ground."
- Pattern: The sword may be drawn, but only proportionately, and only when liberty itself is at stake.

## 4. Public Trust & Navigation

- *Illinois Central* and related doctrines: the state cannot alienate public trust resources.
- Pattern: The state wields the sword of sovereignty, but only to preserve liberty of navigation and commerce for the people.

**Federal Cases:**

**Burdeau v. McDowell, 256 U.S. 465 (1921)**

- **Facts**: Private individuals stole papers from Burdeau's office and turned them over to the government.
- **Holding**: The Fourth Amendment restricts *governmental* action, not private individuals. Evidence obtained by private theft was admissible.
- **Significance**: Drew a sharp line between *state action* and *private misconduct*. Later cases (e.g., *Mapp v. Ohio*) limited this by exclusionary rule doctrine, but Burdeau remains a cornerstone for the "private search" exception.

**Carroll v. United States, 267 U.S. 132 (1925)**

- **Facts**: Prohibition agents searched a car without a warrant, finding liquor.
- **Holding**: Established the **"automobile exception"** to the warrant requirement. Because cars are mobile, probable cause justifies a warrantless search.
- **Significance**: Still central Fourth Amendment doctrine; expanded in later cases like *California v. Carney*.

**United States v. Harding, 475 F.2d 480 (10th Cir. 1973)**

- **Facts**: Harding was convicted of importing obscene materials; the package was opened by a private freight company before FBI involvement.
- **Holding**: No Fourth Amendment violation because the initial search was by a private actor; conviction affirmed.
- **Significance**: Reinforces *Burdeau*: private searches don't trigger Fourth Amendment protections.

**Massachusetts Tort / Criminal Cases:**

**Coblyn v. Kennedy's, Inc., 359 Mass. 319, 268 N.E.2d 860 (1971)**

- **Facts**: Elderly man falsely accused of shoplifting an ascot, detained by store employee, suffered a heart attack.
- **Holding**: False imprisonment; "reasonable grounds" for shopkeeper's privilege must be judged objectively.
- **Significance**: Landmark in defining **shopkeeper's privilege** and limits on private detention.

**McDermott v. W.T. Grant Co., 313 Mass. 736, 49 N.E.2d 115 (1943)**

- **Facts**: Store manager caused plaintiff's false arrest for shoplifting.
- **Holding**: Store liable for false arrest; private actors cannot cloak themselves in police power without probable cause.
- **Significance**: Early Massachusetts precedent on **merchant liability** for wrongful detention.

**Rohan v. Swain, 5 Cush. 281 (Mass. 1849)**

- **Facts**: Constable arrested without warrant on suspicion of felony.
- **Holding**: Peace officers may arrest without warrant if they have **reasonable grounds** to suspect a felony.
- **Significance**: Antebellum articulation of **probable cause** and warrantless arrest authority.

**Massachusetts Criminal Law Cases:**

**Commonwealth v. Donahue, 148 Mass. 529 (1889)**

- **Facts**: Dispute over payment for clothes; defendant assaulted creditor to recover money.
- **Holding (Holmes, J.)**: One cannot use force to recover property, even if it is one's own.
- **Significance**: Limits on **self-help**; forceful repossession is unlawful.

**Commonwealth v. Gagne, 367 Mass. 519, 326 N.E.2d 907 (1975)**

- **Facts**: Pharmacist shot intruder in his store; claimed self-defense.
- **Holding**: Conviction for second-degree murder upheld; jury could reject self-defense.
- **Significance**: Clarifies **malice** and limits of self-defense in homicide.

**Commonwealth v. Kendrick, 351 Mass. 203, 218 N.E.2d 408 (1966)**

- **Facts**: Love triangle homicide; defendant claimed self-defense.
- **Holding**: Jury should have been instructed on manslaughter if excessive force used in self-defense.
- **Significance**: Defines **excessive force in self-defense** as manslaughter, not murder.

**Commonwealth v. Leone, 386 Mass. 329, 435 N.E.2d 1036 (1982)**

- **Facts**: Security guard (special police officer) searched truck driver's bag, found stolen gun.
- **Holding**: Fourth Amendment applies to private security acting with police powers.
- **Significance**: Blurs line between **private search** and **state action**.

**Commonwealth v. Mahnke, 368 Mass. 662, 335 N.E.2d 660 (1975)**

- **Facts**: Defendant abducted and interrogated by private citizens before confessing.
- **Holding**: Statements coerced by private vigilantes may still be inadmissible if later tainted police interrogation followed.
- **Significance**: Extends due process concerns to **private coercion feeding into state action**.

**Commonwealth v. Shaffer, 2 Mass. App. Ct. 658, 318 N.E.2d 914 (1974)**

- **Facts**: Woman shot abusive partner in her home.
- **Holding**: No absolute "castle doctrine"; duty to retreat may still apply in Massachusetts.
- **Significance**: Massachusetts rejects strong "stand your ground" in the home.

**Commonwealth v. Storella, 6 Mass. App. Ct. 310, 375 N.E.2d 348 (1978)**

- **Facts**: Police obtained bullet from defendant's surgery without warrant.
- **Holding**: Evidence admissible; consent and medical procedure justified seizure.
- **Significance**: Illustrates **medical–law enforcement cooperation** and limits of privacy in hospital settings.

**Thematic Connections:**

- **Private vs. State Action**: *Burdeau, Harding, Leone, Mahnke* → where does private conduct end and constitutional protection begin?
- **False Imprisonment / Shopkeeper's Privilege**: *Coblyn, McDermott* → limits on private detention echo Fourth Amendment standards.
- **Self-Defense & Retreat**: *Donahue, Gagne, Kendrick, Shaffer* → Massachusetts courts often impose stricter duties to retreat and limit excessive force.
- **Public vs. Private Enforcement**: *Rohan* (constable authority) vs. *Leone* (private guard as state actor) → the line between public and private policing.

585    This cluster of cases shows the **continuum from private action → state action →**
586    **constitutional scrutiny**, and from **private remedies (false imprisonment, tort)** to **public**
587    **remedies (criminal law, constitutional exclusion)**. Massachusetts cases in particular reveal a
588    **cautious, Holmesian tradition**: limiting self-help, requiring retreat, and scrutinizing private
589    detentions.

590    **The Motto Connection:**

591    If we read this through the Massachusetts motto (*"By the sword we seek peace, but peace only*
592    *under liberty"*) we see that it is a **jurisprudential compass**:

593    • **The sword** = federal supremacy, necessary to preserve the Union.
594    • **Peace** = the stability of a national government strong enough to govern.
595    • **Liberty** = vestiges of sovereignty of the states to ensure the Union is not a consolidated
596      monarchy.


# Piercing Doctrines for Immunity Claims:

598

599    As the result of due diligence spanning decades, I have assembled  what are essentially
600    **categories of claims that, in certain contexts, can pierce or bypass sovereign, absolute, or**
601    **qualified immunity,** with each operating under very specific doctrines:
602
603              A.  Negligence,
604              B.  Pain and Suffering,
605              C.  Breach of Implied Covenant of Good Faith and Fair Dealing,
606              D.  Fraud,
607              E.  False advertising including Press releases,
608              F.  Personal Trespass,
609              G.  Property Trespass,
610              H.  Unfair Trade Practices,
611              I.  Unfair competition,
612              J.  Breach of Fiduciary Duty,
613              K.  Unjust Enrichment,
614              L.  Unfair Debt Collection Practice,
615              M.  Conspiracy,
616              N.  Failure to Prevent Conspiracy,
617              O.  Racketeering.

618    And now a systematic walkthrough to clearly see where the "waiver" or exceptions comes from.


# Framework: Sovereign, Absolute, and Qualified Immunity:

620    • **Sovereign Immunity**: The United States government cannot be sued without its consent.
621      Waivers must be explicit (e.g., Federal Tort Claims Act, Tucker Act).

622   • **Absolute Immunity**: Certain officials (judges, legislators, prosecutors) are immune for core
623     functions.
624   • **Qualified Immunity**: Government officials are shielded unless they violate "clearly established"
625     constitutional rights.

# 626   The Pattern:

627   • **Explicit Waivers**: FTCA (torts), Tucker Act (contracts/takings), APA (agency review).
628   • **Judicially Implied Waivers** (Very limited today).
629   • **Residual Immunity**: Fraud, unfair trade, RICO, conspiracy, generally barred unless
630     Congress has spoken clearly.

631   **Pattern:**

632   • **Mostly Intentional Torts:** Fraud, trespass (personal/property), conspiracy, unfair
633     competition, fiduciary breach, racketeering.
634   • **Unintentional Torts:** Negligence and its damages (pain and suffering).
635   • **Statutory Hybrids:** Unfair trade practices, unjust enrichment, debt collection, RICO are
636     statutory or constitutional overlays that borrow tort-like remedies but don't fit neatly into
637     the intentional/unintentional divide.

638   **The "FTCA Framework":**

639   • **General Rule:** The FTCA (1946) waives sovereign immunity for torts committed by
640     federal employees acting within the scope of employment.
641   • **Exception:** 28 U.S.C. § 2680(a) preserves immunity for claims "based upon the exercise
642     or performance or the failure to exercise or perform a discretionary function or duty."
643   • **Implication:** If the act was **not discretionary** i.e., it violated a mandatory statute,
644     regulation, or policy, then the government's immunity is waived.

645   **The "Lack of Discretion" Waiver:**

646   • **Ministerial vs. Discretionary Acts:**
647     ○ *Ministerial acts* = specific, mandatory duties with no room for judgment. Failure
648        to perform them can trigger liability.
649     ○ *Discretionary acts* = involve policy judgment or choice; immunity remains.
650   • **Key Case:** _Berkovitz v. United States_ (486 U.S. 531, 1988). The Court held that if a
651     federal agency violates a **specific mandatory directive**, the discretionary function
652     exception does not apply.
653   • **Key Case:** _United States v. Gaubert_ (499 U.S. 315, 1991). Clarified that even operational
654     decisions can be discretionary if they are "susceptible to policy analysis."

655   **Practical Examples:**

656   • **Waiver (lack of discretion):**

657          o   FAA inspector fails to follow a mandatory safety checklist.
658          o   Federal prison ignores a regulation requiring specific medical treatment.
659          o   USDA meat inspector stamps "approved" without performing the required test.
660    •   **No waiver (discretionary):**
661          o   FAA decides how to allocate inspection resources.
662          o   Army decides how to design a weapons system.
663          o   Park Service decides whether to post a warning sign at a trailhead.

664    # Notes:

665    •   This is the **safety valve** in the FTCA: it prevents the government from hiding behind
666        "discretion" when it simply **fails to follow its own rules**.

667    **Additional Piercing Doctrines:**

668    **1. Ultra Vires Acts**

669    •   When an official acts *beyond the scope of lawful authority*, immunity may not apply.
670    •   Example: A federal officer seizing property without any statutory or constitutional basis.

671    **2. Ex parte Young Doctrine (1908)**

672    •   Allows suits against state officials in their *official capacity* for prospective injunctive
673        relief to stop ongoing violations of federal law.
674    •   This is one of the most important workarounds to state sovereign immunity under the
675        Eleventh Amendment.

676    **3. Takings Clause (Fifth Amendment)**

677    •   Sovereign immunity does not bar claims for just compensation when the government
678        takes private property for public use.
679    •   The Constitution itself creates a self-executing waiver.

680    **4. Habeas Corpus**

681    •   Immunity does not shield unlawful detention from judicial review.
682    •   The "Great Writ" pierces through otherwise absolute barriers.

683    **5. International Law / Jus Cogens Violations**

684    •   In some contexts, courts have allowed claims against officials for torture, genocide, or
685        crimes against humanity, reasoning that such acts cannot be shielded by immunity.
686    •   Example: *Filártiga v. Peña-Irala* (Alien Tort Statute cases).

687    **6. Ministerial vs. Discretionary Acts**

688  • Immunity often protects discretionary functions, but not ministerial duties (where the law
689    prescribes a specific action).
690  • Failure to perform a ministerial duty can pierce immunity.

691  **7. Statutory Civil Rights Waivers**

692  • **42 U.S.C. §1983**: State actors can be sued for constitutional violations.
693  • **Rehabilitation Act / ADA**: Waivers of immunity tied to federal funding.
694  • **Title VII**: Employment discrimination claims against government employers.

695  **8. Bankruptcy Proceedings**

696  • The Bankruptcy Code abrogates state sovereign immunity in certain contexts (11 U.S.C.
697    §106).
698  • States can be compelled to comply with bankruptcy court orders.

699  **9. Admiralty and Maritime Claims**

700  • The U.S. has waived immunity for certain admiralty claims (Suits in Admiralty Act,
701    Public Vessels Act).
702  • This is a specialized but important carve-out.

703  **10. State-Created Waivers**

704  • Many states have their own tort claims acts, which waive immunity in specific categories
705    (e.g., motor vehicle accidents, premises liability).

# Admiralty–Aircraft Jurisdiction and Renvoi:

707  The Federal Court of Canada, through its Admiralty jurisdiction, expressly recognizes an
708  "aircraft" dimension alongside traditional maritime subjects. This reflects Canada's statutory and
709  procedural framework in which Admiralty is not confined to ships and navigation, but extends to
710  aviation matters that implicate international carriage, liability, and treaty obligations. The
711  classification of "Admiralty – Aircraft" as a distinct proceeding type demonstrates that Canadian
712  law treats certain aviation disputes as falling within the same transnational commercial and
713  navigational sphere historically reserved for maritime law.
714
715  This has significant implications for **renvoi** in private international law. Where a
716  Canadian court asserts Admiralty jurisdiction over an aircraft-related dispute, it may be required
717  to apply foreign substantive law (e.g., under the Montreal Convention or other aviation treaties).
718  If the foreign law itself refers back to Canadian law (or onward to a third system), the doctrine of
719  renvoi becomes engaged.
720
721  The presence of an "aircraft" category within Admiralty thus creates a hybrid
722  jurisdictional space where maritime conflict-of-laws principles, aviation treaties, and renvoi
723  analysis intersect. In practice, this means that Canadian courts could find themselves not only

724 applying foreign aviation law, but also grappling with whether to accept or reject a foreign
725 system's referral back to Canadian law, thereby shaping the scope of liability and remedies
726 available. (See Exhibit <u>Federal Court – Initiate New Preceeding</u>)

727

728    Note: This is not in consideration of the Libellants pleading and brief putting forth a
729 novel "Maritime Nexus Test" which demonstrates that the use of Electronic Bills of Lading
730 ("EBOL") using the UN/EDIFACT system

## 731    Canada

732 - **Federal Court Jurisdiction:** The Federal Courts Act explicitly grants the Federal Court
733   of Canada jurisdiction over "Admiralty" matters. Procedurally, the court's e-filing system
734   even lists *"Admiralty – Aircraft"* as a distinct category of proceeding.
735 - **Implication:** This reflects a deliberate legislative and procedural choice to treat aircraft
736   disputes as part of the same transnational navigational sphere as ships. It acknowledges
737   that aviation, like maritime commerce, is inherently international and requires specialized
738   jurisdiction.
739 - **Conflict of Laws:** Because aviation disputes often involve international treaties
740   (Montreal Convention, Warsaw Convention, ICAO instruments), Canadian courts may
741   need to apply foreign law. If that foreign law refers back to Canadian law, the doctrine of
742   **renvoi** is triggered. Thus, the "aircraft in admiralty" classification creates a hybrid
743   jurisdiction where maritime conflict rules, aviation treaties, and renvoi intersect.

## 744    Comparative Implications for Renvoi

745 - **Canada:** By embedding aircraft within Admiralty, Canada creates a jurisdictional
746   overlap where maritime conflict-of-laws principles (which are historically receptive to
747   renvoi in certain contexts) may apply to aviation disputes. This increases the likelihood
748   that Canadian courts will face renvoi questions when foreign aviation law points back to
749   Canadian law.
750 - **United States:** By excluding aviation from admiralty, U.S. courts avoid this overlap.
751   Renvoi issues in aviation are addressed through treaty interpretation and federal statutory
752   law, not through admiralty conflict rules. This narrows the occasions where renvoi arises.

# 753    Maritime and Admiralty Jurisdiction in Contract:

## 754    What UN/EDIFACT Is

755 - **Full name:** *United Nations rules for Electronic Data Interchange for Administration,*
756   *Commerce and Transport (UN/EDIFACT).*
757 - **Standard:** Adopted as **ISO 9735 (1987)**, making it the global EDI standard outside
758   North America.
759 - **Scope:** Covers commercial, administrative, and transport transactions across industries.

760     •   **Maintenance:** Overseen by **UN/CEFACT** (United Nations Centre for Trade Facilitation
761        and Electronic Business), with updates published in the **UNTDID (United Nations**
762        **Trade Data Interchange Directory)**.

763     **The Structure of UN/EDIFACT Agreements**

764     UN/EDIFACT is not just a technical syntax,  it includes **agreements and rules of conduct** that
765     govern how parties use EDI:

766     •   **Uniform Rules of Conduct ("UNCID"):** Legal and procedural framework for electronic
767        trade data exchange.
768     •   **Message Directories:** Standardized message types (e.g., invoices, bills of lading,
769        purchase orders).
770     •   **Syntax Rules:** Define how data segments, elements, and codes are structured.
771     •   **Interchange Agreements:** Bilateral or multilateral contracts between trading partners
772        specifying which EDIFACT messages will be used, in what versions, and under what
773        conditions

774     UN/EDIFACT is an Electronic Data Interchange ("EDI") protocol used for everything from
775     passenger data to cargo manifests and baggage transfers.

776     •   **Legal certainty:** Provides a recognized framework for cross-border trade, ensuring that
777        electronic documents are treated as valid and enforceable.
778     •   **Efficiency:** Eliminates paper, reduces errors, and speeds up customs clearance, shipping,
779        and payments.
780     •   **Interoperability:** Ensures that different industries and countries can exchange data
781        seamlessly.
782     •   **Global adoption:** Used in shipping, aviation, automotive, retail, and government
783        customs systems worldwide.

784     Other EDI can consist of  Teletype messages over ARINC ("Aeronautical Radio
785     Incorporated"), SITA or Aeronautical Fixed Telecommunication Network ("AFTN") networks
786     or other forms of analog Electronic Data Interchange (EDI) protocols

787     ARINC stands for "Aeronautical Radio Incorporated" and is an aerospace standard that
788     defines how data is transferred in avionics devices. ARINC is used in a variety of nautical and
789     aviation applications.  SITA has entered the Maritime industry with SMARTSEA.
790
791     With EDIFACT agreements airlines enter **bilateral or multilateral agreements** to exchange
792     EDIFACT messages. These messages can contain data elements such as bag tag number, weight,
793     routing. Uses typical transmission protocols such as the ones already mentioned (e.g. SITA,
794     ARINC networks).

795    **Legal Status in Practice:**

796    • **Voluntary adoption:** States and industries incorporate UN/EDIFACT into their
797        **domestic regulations** (e.g., customs clearance systems, shipping documentation).
798    • **Contractual force:** Companies bind themselves through **EDI trading partner**
799        **agreements** that reference UN/EDIFACT.
800    • **International recognition:** Because it is a UN-sponsored standard, it carries significant
801        legitimacy, but it does not have the force of treaty law.

802    **Where Enforcement Actually Comes From:**

803    1. **Private Interchange Agreements**
804        ◦ Trading partners sign **EDI contracts** that specify which EDIFACT messages will
805           be used, how errors are handled, and liability for misuse.
806        ◦ Breach of these agreements can lead to **civil remedies** (damages, termination of
807           contract).
808    2. **Domestic Law & Regulation**
809        ◦ Customs authorities (e.g., U.S. CBP, EU customs) often require
810           EDIFACT-formatted declarations.
811        ◦ Submitting fraudulent or abusive EDIFACT messages can trigger **penalties**
812           **under customs, trade, or fraud statutes**.
813        ◦ Example: False EDIFACT cargo manifests could be prosecuted under **smuggling**
814           **or customs fraud laws**.
815    3. **Industry Rules**
816        ◦ Sectors like shipping, aviation, and automotive embed EDIFACT into their
817           operational rules.
818        ◦ Violations may lead to **loss of accreditation, blacklisting, or commercial**
819           **sanctions**.
820    4. **There is No "EDIFACT police."** The UN does not enforce compliance.

821    • **Enforcement is indirect:**

822        ◦ Through **contracts** (breach of EDI agreements).
823        ◦ Through **domestic law** (fraud, customs, data protection).
824        ◦ Through **industry governance** (loss of trading privileges).
825        ◦ **UNCID (Uniform Rules of Conduct):** Provides a model legal framework,
826           but only has effect if incorporated into contracts or national law.

827    **The "Maritime Nexus Test" is Satisfied:**

828
829    UN/EDIFACT Protocols relevant to Maritime Commerce**:**
830
831    PAXLST -- Qualifies as "tackle-to-tackle"
832    IFTMBC-- Booking Confirmation Message
833
834    Other key message types:

835
836      a.  BAG ("Baggage Information Message") Communicates details about checked baggage
837          between carriers and ground handlers.
838      b.  IFCSUM ("Flight Connection Summary") Used to coordinate passenger and baggage
839          connections across flights.
840      c.  PNRGOV – Passenger Name Record Government Message Includes passenger and
841          baggage data for customs and security screening
842

843       PNR in PNRGOV refers to **Passenger Name Record** which is a digital record created when
844  a passenger books a flight. It resides in a **Computer Reservation System (CRS)** or **Global**
845  **Distribution System (GDS)** and contains all relevant travel details for one or more passengers
846  traveling together.

847       Conclusion: The traditional Maritime Nexus Test is satisfied because the rule with
848  Ordinary Bills of Lading the Booking of Cargo is an Ordinary Business Contract, but once cargo
849  is loaded, it becomes a Contract of Affreightment which is when the Contract then converts to
850  Maritime Contract.  Additionally, With EDIFACT, passengers are processed as cargo in
851  passenger manifests using the PAXLIST command.  Once the PAXLIST command is
852  transmitted, it constitutes tackle-to-tackle*.* Tackle-to-tackle constitutes carriage-of-cargo and
853  converts Maritime Contracts to Admiralty Contracts and would be subject to Admiralty
854  Jurisdiction.


855 # Background Case at this Court:

856
857       Since no instructions were provided for my denial for my FTCA claim submitted to the
858  United States Department of Justice, Civil Division.  And the filing system with the SDNY
859  requires me to have a docket and apply for ECF privledges, I have no option but to file an
860  original action under Federal Civil RICO upgrading FTCA as a cause-of-action.


861 # Piercing Corporate Veils:

862
863       The Napoleonic Code, enacted in 1804, emphasized centralized legal authority and equality
864  before the law, laying the groundwork for modern civil law systems, including in the U.S. Its
865  influence extends to enabling robust enforcement mechanisms against organized crime, where
866  state power can target hierarchical entities.

867
868       This aligns with the idea of using civil enforcement tools like RICO, which borrows from
869  civil law traditions to dismantle syndicates through asset forfeiture and broad liability, rather
870  than just criminal prosecution.
871

872    **RICO as a Civil Enforcement Tool:**
873
874    RICO allows for both criminal and civil actions against individuals or entities engaged in a
875    "pattern of racketeering activity" (e.g., bribery, extortion, drug trafficking) involving at least two
876    acts within 10 years. Unlike 21 U.S. Code § 848's focus on drug-related continuing criminal
877    enterprises, RICO's scope is wider, covering any racketeering tied to an enterprise.
878
879    Civil RICO suits can impose triple damages and attorney fees, making it a potent tool against
880    syndicates, even if their activities stretch into statutes like  21 U.S. Code § 848 or the obscure
881    statute Title 18 U.S. Code § 225 that RICO was designed to replace.
882

883    **Corporate Tree Diagram:**
884
885    The diagram in the supplied Exhibit depicts a traditional corporate hierarchy with a clear
886    top-down structure, starting from the CEO at the apex, followed by executive and senior Vice-
887    president levels, divisional managers, and master operating or line department roles.
888
889    Supporting departments like Legal, Accounting, Personnel, Public Relations, Advertising,
890    and Research are shown as separate entities reporting to higher management levels.
891
892    The "Caesarean" EITC and Caesar's Legion models:
893

894    **The East India Trading Company ("EITC"):**
895
896    The East India Trading Company ("EITC") and Caesar's Legions offer intriguing
897    historical models for corporate structures, distinct from the Napoleonic Code and Napoleon's
898    maxims. The EITC, was a British joint-stock company founded in 1600, that evolved from a
899    trading entity into a de facto colonial ruler, leveraging a private army of up to 260,000 soldiers,
900    twice the size of the British Army at times, to control trade and territories in India and beyond.
901    Its hierarchical organization, with a London board directing regional presidencies (e.g., Bengal,
902    Madras, Bombay), mirrors the diagram's top-down structure, where the CEO and executives
903    oversee specialized departments.
904
905    The EITC's success relied on centralized authority, strategic alliances, and military power,
906    resembling a corporate empire that prioritized profit through monopolies and taxation, often at
907    the expense of local economies.
908
909    The EITC's structure was a hybrid of corporate and governmental authority, with a board
910    of directors in London acting as the equivalent of my diagram's CEO, overseeing executive Vice
911    Presidents and regional presidencies. These presidencies (e.g., Bengal) functioned like divisional
912    managers, managing local operations—trade, taxation, and military control—much like the
913    master operating or line departments in my hierarchy.
914

915       Specialized departments, such as the EITC's legal and accounting arms (to manage trade
916  disputes and profits), align with the Legal and Accounting Departments in my Corporate Tree
917  Diagram. The EITC's use of a private army suggests a Public Relations or Advertising
918  Department role in projecting power and legitimacy, akin to modern corporate branding.
919

920       A key operational parallel is the EITC's centralized decision-making and delegation to
921  regional units, mirroring the diagram's top-down flow, with profit maximization driving
922  efficiency e.g., its tea trade monopoly yielding £40 million annually by the 19th century
923  (adjusted to modern value, roughly £4 billion).
924

## Caesar's Legions ("Legions"):

925

926

927       Caesar's Legions, was part of the Roman military under Julius Caesar, and operated with
928  a rigid, hierarchical command structure, from the general down to centurions and soldiers,
929  optimized for conquest and administration. This model emphasizes discipline, loyalty, and a
930  clear chain of command, akin to the diagram's line department hierarchy. The legions' ability to
931  govern conquered territories and extract resources parallels a corporate model where regional
932  managers (divisional managers) enforce policies to maximize output, reflecting a militarized
933  corporate efficiency.
934

935       Caesar's Legions operated with a military hierarchy that translates well to a corporate
936  model. The general (Caesar) parallels the CEO, issuing strategic directives, while legates and
937  tribunes resemble senior Vice Presidents, overseeing legions (divisional managers) composed of
938  cohorts led by centurions (master operating roles).
939

940       The legions' support units: engineers, quartermasters mirror the Corporate Tree's
941  Personnel or Research Departments, ensuring logistical and tactical success.
942

943       Operationally, the legions' standardized training and rapid deployment (e.g., conquering
944  Gaul in 8 years) reflect a corporate focus on efficiency and scalability, similar to a line
945  department hierarchy optimizing output. The legions' governance of provinces, extracting tribute
946  and resources, parallels a corporation's regional management maximizing revenue, with
947  discipline enforced through a clear chain of command.
948

949       Both models emphasize a strong central authority (CEO/general) supported by
950  specialized, hierarchical layers, aligning with the Corporate Tree Diagram's structure. The
951  EITC's economic focus and the legions' military efficiency suggest that the diagram's
952  departments could be seen as strategic units: Legal and Accounting for compliance and profit,
953  Public Relations and Advertising for market influence, and Research for innovation—much like
954  the EITC's trade networks or the legions' engineering corps.
955

956       A key difference is that the EITC has profit-driven flexibility versus the legions' rigid,
957  conquest-oriented discipline, but both relied on loyal, specialized subordinates, akin to the
958  Corporate Tree Diagram's Vice-presidental and divisional levels.
959

**Organizational Structure Tree("OST"):**

The Organizational structure tree depicts a hierarchical model with a clear chain of command, starting from a "Boss" at the core, supported by a "Boss' Boss" and a "Next Higher Superior" above, and extending downward through subordinates to regional offices and other departments.

**Structure Overview:**

- Top-Down Hierarchy: The tree follows a traditional pyramid structure, with the "Boss" as the central figure, overseeing direct subordinates. The "Boss' Boss" and "Next Higher Superior" indicate multiple layers of authority, suggesting a large organization with escalating levels of oversight.
- Lateral Connections: Dashed lines to "Other co-equal positions" and "Other positions at this level" show peer relationships, allowing for collaboration or coordination across departments or divisions.
- Subordinate Levels: The structure extends to "subordinates" and "subordinates' subordinates," with specific mentions of "Regional office," "Another Dept.," etc., indicating a decentralized operational base reporting upward.
- Flexibility: The use of dashed lines and generic labels (e.g., "Dept. or Division Director") suggests adaptability, where roles can vary by context or organization size.

**Comparison to the Previous Models:**

- "OST" Diagram:  This tree is less detailed than the former corporate hierarchy (with CEO, Vice-president's, and specific departments like Legal or Public Relations). It's more generic, focusing on a simplified chain-of-command rather than specialized functions.
- "EITC" and "Legions": The EITC's regional presidencies align with the "Regional office" tier, while the legions' centurion-to-cohort structure mirrors the subordinate layers. The "Boss' Boss" could represent the EITC's Governor or a legion general, with the "Next Higher Superior" as a higher council or imperial oversight.
- Napoleonic Influence: The centralized authority (Boss) and clear reporting lines reflect the Napoleonic Code's emphasis on structured governance, adaptable to civil enforcement against syndicates under RICO, Title 18 U.S. Code § 225 or 21 U.S. Code § 848.

**Strengths:**

- Clarity: The straightforward hierarchy ensures accountability, with each level reporting to a single superior, reducing ambiguity.
- Scalability: The inclusion of regional offices and multiple subordinate tiers allows the structure to expand across geographies or functions.
- Coordination: Lateral connections facilitate communication among peers, enhancing operational efficiency.

1002  **Key Vulnerability:** Targeting the "Boss" or "Boss' Boss" could disrupt the entire structure, a
1003  key consideration for RICO enforcement.
1004
1005  In the context of a syndicate (e.g., blending EITC and legions models), this tree could
1006  represent a criminal enterprise. The "Boss" might be the syndicate leader, the "Next Higher
1007  Superior" a shadowy overseer (e.g., a cartel board), and subordinates regional drug or product
1008  distributors. The lateral connections could indicate allied gangs or departments (e.g., money
1009  laundering, enforcement), fitting RICO's "pattern of racketeering" or 21 U.S. Code § 848's
1010  multi-person operation.
1011
1012  Civil enforcement could target the hierarchy's assets, leveraging the Napoleonic principle
1013  of centralized liability. This structure is a versatile framework, adaptable to both legitimate and
1014  illicit organizations.
1015
1016  An interesting parallel arises when comparing my novel "veil piercing" methodology:
1017  Administrative or Civil Enforcement
1018
1019  Both models suggest a corporate structure where power concentrates at the top, supported
1020  by specialized units, and relies on enforcement mechanisms: Military for the "Legions" and
1021  "EITC", legal for the Napoleonic.
1022
1023  Unlike the Napoleonic Code's legal framework or Napoleon's maxims' strategic
1024  leadership, these models highlight operational control and territorial dominance, offering a
1025  pragmatic, and ruthless if not vicious, blueprint for corporate organization.
1026
1027  Applications of Napoleonic "Civil Enforcement, such as RICO "Racketeering" against
1028  Syndicate-type organizations provide a framework for applying statutes like 21 U.S. Code § 848
1029  or what was designed to "replace" it, the Racketeer Influenced and Corrupt Organizations Act
1030  ("RICO") against syndicate-type organizations.
1031

# Civil RICO Case Statement (Table Format):

1033  As is required by the courts, I will submit an inline Table Format of my own RICO case
1034  statement which will is provided as an Exhibit.
1035

| Template Question | My Allegations / Responses |
|---|---|
| **1. Is the alleged unlawful conduct in violation of 18 U.S.C. §§ 1962(a), (b), (c), and/or (d)?** | Yes. Violations are alleged under §§ 1962(a), (b), (c), and (d). |
| **2. What is the enterprise in detail?** | **a.** Enterprise consists of John Doe, Jane Doe and Richard Roe, private individuals/agents, agencies, judges, clerks, and court officers. |

| Template Question | My Allegations / Responses |
|---|---|
| | **b.** Structure: association-in-fact; Purpose: obstruct justice, deny statutory/treaty obligations, enrich participants; Roles: private actors as instigators, officials as facilitators.<br>**c.** Defendants acted as members/facilitators.<br>**d.** Defendants are associated through roles in directing/facilitating racketeering.<br>**e.** Participation: abuse of discretion, obstruction, failure to execute duties.<br>**f.** Defendants are members of the enterprise.<br>**g.** Defendants are perpetrators, not victims. |
| **3. Who or what are the defendant "persons" in detail?** | John Doe, Jane Doe and Richard Roe, individuals acting under color of law and in private capacity. |
| **4. Are there any other alleged wrongdoers or persons not named as defendants?** | Yes. Other unnamed agents, attorneys, and officers of the United States. |
| **5. What is the "pattern of racketeering activities"?** | **a. Predicate Acts:** Negligence; Pain and Suffering; Breach of Good Faith; Fraud; False Advertising; Trespass (personal/property); Unfair Trade Practices; Unfair Competition; Breach of Fiduciary Duty; Unjust Enrichment; Unfair Debt Collection; Conspiracy; Failure to Prevent Conspiracy; Racketeering; Breach of Duty; Contempt of Congress; Breach of Trust; Lack of Discretion; Malfeasance; Misfeasance; Nonfeasance; Breach of Ministerial Duties; Obstruction of Justice.<br>**b. Dates/Participants:** 2012–2025, involving John Doe, Jane Doe and Richard Roe, and associated officials.<br>**c. Fraud Particularity:** Misrepresentations in filings, press releases, proceedings, causing reliance and injury.<br>**d. Criminal Convictions:** None known.<br>**e. Civil Lawsuits:** Related FTCA filings.<br>**f. PRA Formation:** Continuous, related acts forming closed- and open-ended pattern.<br>**g. Common Plan:** Yes, to obstruct justice and deny treaty obligations.<br>**h. Securities Fraud:** Not alleged. |
| **6. Is the PRA and the enterprise separate or merged?** | They have merged; the enterprise itself is the vehicle for racketeering. |
| **7. Relationship between enterprise and PRA?** | Racketeering activities corrupted judicial/administrative functions beyond lawful daily activities. |
| **8. Benefits received?** | Unjust enrichment, avoidance of liability, unlawful control, |

| Template Question | My Allegations / Responses |
|---|---|
|  | financial/institutional gain. |
| **9. Effect on commerce?** | Obstructed aviation safety enforcement, interfered with treaty obligations, disrupted interstate and international commerce. |
| **10. §1962(a) specifics** | **a.** Income received by defendants and enterprise members. **b.** Used to maintain control and obstruct justice. **c.** Plaintiff injured by reinvestment of racketeering income. |
| **11. §1962(b) specifics** | **a.** Defendants acquired/maintained interests in enterprise through unlawful acts. **b.** Persons and enterprise overlap. **c.** Plaintiff injured by unlawful control. |
| **12. §1962(c) specifics** | **a.** John Doe, Jane Doe and Richard Roe, and officials employed by/associated with enterprise. **b.** Same entities acted as liable persons and enterprise members. |
| **13. §1962(d) conspiracy** | **a.** Agreement: to obstruct justice, breach duties, commit predicate acts. **b.** Agreement covered predicate acts and furthering endeavor. **c.** Object: unlawful control, denial of obligations. **d.** Period: 2012–2025. **e.** Actions: fraudulent filings, obstruction, abuse of discretion. **f.** Knowledge: guilty knowledge of unlawful acts. **g.** Plaintiff materially injured. |
| **14. Injury to business/property** | Loss of rights, obstruction of claims, economic harm, denial of treaty protections. |
| **15. Foreseeability of injury** | Injuries were foreseeable consequences of racketeering activity. |
| **16. Relationship between injury and RICO violation** | Injuries flow directly from violations of §§1962(a)(b)(c)(d). |
| **17. Damages sustained** | US$32 billion, not trebled under RICO, joint and several liability. |
| **18. Direct causal relationship** | Injuries proximately caused by racketeering activity. |
| **19. Damages detailed** | Economic harm: $32 billion; not trebled under RICO; liability apportioned jointly and severally. |
| **20. Relevant time period** | 2012–2025 (present). |
| **21. Closed- or open-ended?** | Both: closed-ended (2012–2025) and open-ended (continuing conduct). |
| **22. Other victims** | Other litigants, citizens, and entities denied due process, treaty enforcement, and lawful adjudication. |
| **23. Other federal causes of action** | FTCA (28 U.S.C. §§ 1346(b), 2671–2680); Admiralty jurisdiction under Rule C. |

| Template Question | My Allegations / Responses |
|---|---|
| **24. Other FCRs** | Potential related qui tam and civil RICO actions (case numbers TBD). |
| **25. Criminal prosecutions** | None known; potential prosecutions may arise. |
| **26. Administrative actions** | Possible disciplinary/administrative proceedings against federal officers. |
| **27. Pendent state claims** | Negligence, fraud, breach of fiduciary duty, unjust enrichment, conspiracy, related torts. |
| **28. Additional information** | Breach of treaty obligations: Civil Aviation Convention, Sabotage Convention, Montreal Convention, Airport Violence Protocol. |

1036

1037 Additional "8. Basis of Claim" to be added to my original my FTCA claim submitted to the
1038 United States Department of Justice, Civil Division on 6/3/2025:
1039

1040 • Breach of Duty
1041 • Contempt of Congress
1042 • Breach of Duty
1043 • Breach of Trust
1044 • Lack of Discretion
1045 • Malfeasance
1046 • Misfeasance
1047 • Nonfeasance
1048 • Breach of Duty execute Ministerial and Mechanical Duties
1049 • Obstruction of Justice
1050

1051 Also including:
1052

1053 • Felony enhancement of all injuries under United States Sentencing Commission 33 U.S.
1054   Code § 413 "Abuse of Position of Trust or Use of Special Skill"
1055 • Breach of the Duty of United States attorneys and other Federal officers in enforcement
1056   of provisions; arrest of offenders
1057 • Violation of Rule C, Supplemental Rules for Certain Admiralty and Maritime Claims
1058 • Failure to execute, if available or for lack of procedure or precedence for:
1059   o Warrant of Arrest in Rem
1060   o Writ of Assistance
1061   o Writ of Attachment
1062   o Writ of Body Attachment
1063   o Writ of Execution
1064   o Writ of Garnishment
1065   o Writ of Replevin
1066   o Writ of Sequestration
1067   o Writ of Information In Rem

o   Latin informations
o   Writ of Devenerunt

Treaty Obligations:

Breach of Duty to Prosecute under the:

- The Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation,
- The Sabotage Convention ,
- The Montreal Convention,
- Protocol for the Suppression of Unlawful Acts of Violence at Airports serving International Civil Aviation

RICO is not only the upgrade for the cause-of-action and choice-of-law but it is also both an injury ("RICO injury") and the basis for the injuries, stemming from the mishandling of the case(s) with mechanical, procedural and docketing errors.

Failure to comply with the RICO ACT is in and of itself Contempt of Congress.  The general atmosphere of "Judicial Immunity for White Collar Crime" is proof of this.

When private power or private individuals become quasi-sovereign this triggers the entire constitutional as protections.  Government prosecutions, without private civil enforcement would be tyranny, it would create a Consolidated Monarchy as a Racketeering Enterprise.

# The Doctrine of Non-delegation of Rewards or Penalties:

Pub. L. 104–19, title III, §3001, July 27, 1995, 109 Stat. 250 provides that: "Any funds made available to the Attorney General heretofore or hereafter in any Act shall not be subject to the spending limitations contained in sections 3059 and 3072 of title 18, United States Code Provided, That any reward of $100,000 or more, up to a maximum of $2,000,000, may not be made without the personal approval of the President or the Attorney General, and such approval may not be delegated."

# Background of FTCA Claim:

What follows is an inline version of the .pdf form submitted to the United States Department of Justice Civil Division on June 3rd, 2005:

# ORIGINAL CLAIM FOR DAMAGE, INJURY, OR DEATH

Based on FORM APPROVED OMB NO. 1105-0008

**1. Submitted to Appropriate Federal Agency:**

U.S. Department of Justice Civil Division
ATTN: FTCA and XXXXXX Claim
950 Pennsylvania Avenue NW, Washington, D.C. 20530-0001
202-514-2000

**2. Name, address of claimant, and claimant's personal representative if any.**

Turiyan M Gold Special Prosecutor / Private Attorney General / Relator
4700 12th Ave NE, Apartment 501
Seattle, WA 98105

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | March 1, 1975 | Single | 11/08/2024 Friday | 9:28am |

**8. BASIS OF CLAIM**

XXXXX Violation, Negligence, Pain and Suffering, Breach of Implied Covenant of Good Faith and Fair Dealing, Fraud, False advertising including Press Releases, Persona Trespass, Property Trespass, Unfair Trade Practices, Unfair competition, Breach of Fiduciary Duty, Unjust Enrichment, Unfair Debt Collection Practice, Conspiracy, Failure to Prevent Conspiracy, Racketeering. RICO Injury, Failure to Prosecute the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, Sabotage Convention and the Montreal Convention.

**9. PROPERTY DAMAGE** (Blank)

**10. PERSONAL INJURY/WRONGFUL DEATH**

RICO Injury, Failure to Prosecute RICO and the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, Sabotage Convention and the Montreal Convention. Lack of Discretion Behind the Bench, Lack of Discretion, Abuse of Discretion, Arbitrary and Capricious "without observance of procedure required by law."

**11. WITNESSES** (Blank)

1129    **12. AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL |
|---|---|---|---|
|  | US$32,000,000,000 |  | US$32,000,000,000 |

1130    **12d. Total: Thirty-Two Billion Dollars and No Cents**

1131    **Certification**

1132    I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES
1133    CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN
1134    FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT | 13b. PHONE NUMBER | 14. DATE OF SIGNATURE |
|---|---|---|
| _/s____Turiyan M Gold_____ | 360-970-4840 | 6/3/2025 |

1135    **Civil Penalty for Fraudulent Claim**

1136    The claimant is liable to the United States Government for a civil penalty of not less than $5,000
1137    and not more than $10,000, plus 3 times the amount of damages sustained by the Government.
1138    (31 U.S.C. 3729).

1139    **Criminal Penalty for Fraudulent Claim or False Statements**

1140    Fine, imprisonment, or both. (18 U.S.C. 287, 1001).

1141    # INSURANCE COVERAGE

1142    **15. Do you carry accident insurance?** ⊠ No

1143    **16. Have you filed a claim with your insurance carrier in this instance?** ⊠ No

1144    **17. If deductible, state amount:** (Blank)

1145    **18. If a claim has been filed with your carrier, what action has your insurer taken?**

1146    United States District Court of the District of Columbia Gold v. Global Aerospace Underwriting
1147    Managers LTD Case #: 24-CV-03296-RC had subrogation features by virtue of Qui Tam and

1148  Federal Civil RICO, it was designated "In Admiralty" and served against the Insurer of Party
1149  Defendant which was Global Aerospace Underwriting Managers LTD whom insures Crown
1150  airline and airport facilities in Canada.

1151  **19. Do you carry public liability and property damage insurance?** ☒ No

1152  # Remedies Sought:
1153

1154  **12d. Total:** US$32,000,000,000
1155  **12d. Total:** Thirty-Two Billion Dollars and No Cents
1156
1157  …or to be otherwise signed into law…
1158
1159  Respectfully Submitted,
1160
1161  Signed:____/s/_____Turiyan M Gold
1162
1163  Date: October 9, 2025 6:00PM(PT)